Norman Perlberger, Esquire
Eliot H. Lewis, Esquire                         Attorneys Pro Hac Vice for Plaintiff
POMERANTZ PERLBERGER & LEWIS LLP
21 South 12th Street, 7th Floor
Philadelphia, PA 19107
(215) 569-8866
nperlberger@ppl-law.com
ehlewis@ppl-law.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **DEBORAH WILSON,** | : | CIVIL ACTION NO. C07-3431 BZ |
|             **Plaintiff** | : | |
| | : | |
| vs. | : | |
| | : | |
| **COMPASS VISION, INC.** and | : | |
| **NATIONAL MEDICAL SERVICES, INC.** | : | |
| **D/B/A NMS LABS** | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff, by way of Amended Complaint against Defendants, upon information and belief, alleges as follows:

### PARTIES

1. Plaintiff, **DEBORAH WILSON** ("**MS. WILSON**"), is a citizen and resident of California, residing at 361 Garden Common, Livermore, CA 94551.

2. Defendant, **COMPASS VISION, INC. ("COMPASS")** is a corporation with its principal place of business in Oregon at SW Town Center Loop E, Wilsonville, ORE 97070. It has transacted business in California, including the business that gives rise to the causes of action at issue.

3. Defendant Compass is a third party administrator ("TPA"), specializing, inter alia, in the design, implementation, and management of drug and alcohol testing programs, including the collection of urine samples.

4. On information and belief defendant Compass contracted with the California State Board of Nursing, through Maximus, Administrator of the California nurses' recovery program, to be the TPA administering drug and alcohol testing of nurses, including the testing of the plaintiff in the Northern District of California.

5. Defendant **NATIONAL MEDICAL SERVICES, INC. DBA NMS LABS ("NMS")** is a corporation with its principal place of business in Pennsylvania at 3701 Welsh Road, Willow Grove, PA 19090. NMS also has lab testing facilities and offices throughout the United States. It has transacted business in California, including the business that gives rise to the causes of action at issue.

6. On information and belief defendant NMS through defendant Compass contracted with the California State Board of Nursing, through Maximus, to do EtG (ethyl glucuronide) testing of health care providers, including the plaintiff, who is a nurse.

## JURISDICTION AND VENUE

7. Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. Section 1332 (a), and that damages exceed, exclusive of interest and costs, the sum of Seventy-five Thousand ($75,000.00) Dollars.

8. Venue lies in the Northern District of California as the plaintiff resides therein and the defendants are transacting substantial business in this District.

**OPERATIVE FACTS**

9.  As a TPA, Compass contracts its services to various state and municipal agencies, as well as state licensure boards. At all relevant times pertinent to this action Compass provided TPA services to the California State Board of Nursing. The Board administers, inter alia, the licensing privileges of registered nurses.

10. At all times relevant hereto, NMS and Compass provided to the Board, the results and interpretation of EtG alcohol testing upon registered nurses, including plaintiff.

11. Because of the sensitive nature of their positions with respect to patient care, California registered nurses, who have an admitted history of addiction, are allowed to enter into Diversion Program Recovery Contracts with Maximus, by which they agree to submit to random urine analysis to document a drug-free condition in a known "zero-tolerance" environment.

12. Random drug screening is not a requirement for registered nurses in California, unless they have an admitted history of addiction, and have voluntarily entered into an agreement as part of continued employment or are placed on probation.

13. "EtG" stands for ethyl glucuronide, a metabolite of alcohol, and was reported by Gregory Skipper, M.D. ("Dr. Skipper") and Friedrich Wurst, M.D., in November 2002 at an international meeting of the American Medical Society, to provide proof of alcohol consumption as much as 5 days after drinking an alcoholic beverage, well after the alcohol itself had been eliminated from the body.

14. In 2003, because of these and other reportedly remarkable results (e.g., positive findings, confirmed by admissions by the tested individuals, after traditional urine tests had registered negative), EtG testing began in the United States.

15. On information and belief, Compass and NMS became leading proponents of EtG testing, and starting in 2003, published statements and claims promoting the absolute reliability and validity of EtG in detecting alcohol abuse, in promotional materials, on websites, in published articles and in statements by their sales personnel, including promoting EtG testing as the "gold standard."

16. On information and belief, Compass and NMS initially established a reporting limit or cutoff of 250ng/ml at or over which EtG test results would be reported as "positive" for drinking alcohol. This was later changed by the defendants to 500ng/ml.

17. It is believed and therefore averred that on laboratory reports indicating the results of EtG testing, issued at relevant times to this action, National Medical Services included the statement that "any value above 250 ng/ml indicates ethanol consumption."

18. It is believed and therefore averred that Compass Vision claims that any EtG test result of 500 ng/ml and above conclusively proves intentional consumption of an alcoholic beverage, and that Compass sponsored a paper with that claim by Dr. Martha Brown, its employee and Medical Review Officer.

19. It is believed and therefore averred that based on such unequivocally conclusive statements and claims by the defendants, California instituted EtG testing and the State Board of Nursing, through Maximus, became a signatory to a service contract with Compass as its TPA and NMS as a testing lab facility for EtG testing programs.

20. It has come to light about EtG testing that:

    a. Many ordinary products, including the omnipresent Purell sanitizer and other hand sanitizers used in hospitals throughout the country, contain ethanol;

      b.      The use or exposure to such products – known collectively as "incidental" or "involuntary" – could result in positive test results, since they all would metabolize as ethyl glucuronide;

      c.      The cutoffs of 250ng/ml and 500ng/ml are arbitrary standards since incidental exposure to ethanol-containing products could show up at levels well above these levels;

      d.      The published state of scientific knowledge, going as far back as March 2004, included the information set forth in subparagraphs a-c above.

21.    This has not deterred the $4 billion-a-year industry, and the defendants, it is believed and therefore averred, solely due to a motive of profits, (a) continue to promote the EtG test as valid, (b) have not established a non arbitrary cutoff; and/or, (c) have not repudiated the test to the licensing boards and agencies.

22.    On August 12, 2006, The Wall Street Journal published a front-page article, titled "A Test for Alcohol – And Its Flaws."

23.    Quoting Dr. Skipper, among others, the article includes:

"Little advertised, though, is that EtG can detect alcohol even in people who didn't drink. Any trace of alcohol may register, even that ingested or inhaled through food, medicine, personal-care products or hand sanitizer."

"The test 'can't distinguish between beer and Purell' hand sanitizer, says H. Westley Clark, director of the Federal Substance Abuse and Mental Health Services Administration. . . 'When you're looking at loss of job, loss of child, loss of privileges, you want to make sure the test is right", he says…"

"Use of this screen has gotten ahead of the science,' says Gregory Skipper…"

24.    In a February 2007 article in the magazine "New Scientist," Dr. Skipper is quoted that:

"…there is not yet an agreed threshold concentration that can be used to separate people who have been drinking from those exposed to alcohol from other sources. Below 1000 nanograms of EtG per millilitre of urine is probably 'innocent', and above 5000 booze is almost certainly to blame. In between there is a "question zone…"

5

25.     Upon information and belief, representatives of Compass and NMS continue to deny and challenge these warnings, insisting that the tests are accurate and reliable measurements based on alleged scientific research.

26.     On September 28, 2006, SAMHSA, a federal agency that is part of the U.S. Department of Health and Human Resources, issued an Advisory, which on the first page contained a "grey box" warning, as follows:

> "Currently, the use of an EtG test in determining abstinence lacks sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a criminal justice or a regulatory compliance context, has truly been drinking. Legal or disciplinary action based solely on a positive EtG, or other test discussed in this *Advisory* is inappropriate and scientifically unsupportable at this time. These tests should currently be considered as potential valuable clinical tools, but their use in forensic settings is premature."

27.     Defendants have refused to follow the SAMHSA Advisory and continue to utilize an arbitrary cutoff, and support their "positive" findings to the Board (and other licensing and law enforcement agencies) in the face of disciplinary action against the tested individuals.

28.     Defendants, by promoting, advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the drug and alcohol testing program, and/or collecting the urine samples and/or utilizing, reporting and interpreting the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, had a duty to use a reasonable degree of care to avoid erroneous test results.

29.     Plaintiff, as a nurse, was an intended test subject and defendants knew that her license, occupation, and reputation would be in jeopardy if she tested positive.

30.     Plaintiff by entering into the voluntary screening program, both for rehabilitative and occupational reasons, relied on the validity of the tests to which she subjected herself – with the goal that she could provide laboratory evidence of her abstinence.

31.   Because of the obvious, foreseeable, serious and devastating consequences (including, but not limited to damage to plaintiff's reputation, credibility and emotional well being) of reporting that the results were positive (within cutoffs established by the defendants), defendants had to use a reasonable degree of care to avoid erroneous test results to the foreseeable test subjects, including the plaintiff.

32.   Instead, upon information and belief, defendants acted negligently and/or recklessly by:

    a.   Marketing their tests without conducting adequate scientific or medical studies;

    b.   Establishing cutoffs over which test results would be reported as "positive" that were arbitrary and scientifically unreliable and invalid;

    c.   Promoting the EtG test with unsupported and false statements that a positive EtG test would unequivocally establish that the subject individual had consumed alcoholic beverages;

    d.   Publishing warnings that the failure to conduct such a test would be negligence on the part of an employer or licensing board;

    e.   Falsely asserting that the EtG test was the "gold standard" in ferreting out former alcoholics or drug users who were resuming or beginning to engage in prohibited alcoholic consumption in occupations requiring a "zero tolerance";

    f.   Falsely asserting that EtG is not detectable in the urine unless an alcoholic beverage has been consumed, thereby concealing that incidental or involuntary exposure or consumption of products containing alcohol could result in positive findings;

    g.   Failing and refusing to re-evaluate and re-set cutoff limits at levels that were scientifically sound and reliable markers for detecting the prohibited activity of alcoholic beverage consumption, and excluding other causes for their results;

    h.    Failing to heed the warnings or cautionary advisories issued by Dr. Skipper, SAMHSA and others – that the cutoff levels were unreliable and arbitrary, and that incidental use could trigger positive results at levels at or above the cutoffs – and, instead, denying publicly and maintaining the warnings were insufficient to discredit the EtG test and its cutoff limits;

    i.    Failing to protect the plaintiff from foreseeable substantial harm in the form of disciplinary and punitive measures, when their EtG test systems were employed and relied upon for their accuracy and reliability;

    j.    Utilizing, reporting and interpreting the EtG results of plaintiff to assert that plaintiff was violating her recovery by intentionally drinking alcoholic beverages.

33. It was foreseeable to the defendants that false positive EtG results would severely damage the reputation and credibility of nurses who were maintaining their recovery from addiction, and that the apprehension of further false positives and the damage to their reputation would cause severe anxiety and emotional distress to such professionals, who had spent years in education to gain the right to practice their chosen profession, and who had in actuality maintained their recovery by overcoming addictions in order to reestablish their reputations as competent professionals.

## COUNT I
## DEBORAH WILSON V COMPASS VISION & NMS

34. Plaintiff Deborah Wilson incorporates by reference paragraphs 1-33 as if set forth fully hereunder.

35. In or about May 2003, after admitting to drug dependency, Deborah Wilson signed a recovery agreement with the California State Board of Nursing, submitting herself to a recovery program including, inter alia, future random urine testing.

36. At all relevant times after July 2004, while participating in the program and while working as a registered nurse, Ms. Wilson maintained her recovery and sobriety, denied

8

intentionally drinking any alcoholic beverages, denied any relapse and did not drink any alcoholic beverage.

37. At all relevant times after July 2004, Ms. Wilson completely complied with all of the aspects of her program, including attending meetings, and her employment evaluations were excellent.

38. After almost a year of total compliance with the program, on or about May 16, 2005, Ms. Wilson submitted to a random urine analysis collected by Compass Vision and performed by NMS.

39. On or about May 25, 2005, Ms. Wilson first received notice of a "positive" result of 770 ng/ml on the EtG test as reported and interpreted by defendants Compass Vision and NMS, despite the fact that she had not drank an alcoholic beverage, and suffered injury when she was placed in violation of her program and was ordered to walk off of her job.

40. On or about June 10, 2005, Plaintiff had a subsequent EtG test on a urine sample collected by Compass and performed by NMS which was later reported and interpreted as "positive" by both defendants.

41. Ms. Wilson continued to declare and maintain that she had not drank alcoholic beverages in violation of her agreement, but she was labeled a liar, and not believed, due to the actions of both defendants, including Compass Vision through its MRO, in maintaining that these EtG tests were proof that she had drank alcoholic beverages.

42. Ms. Wilson continued to submit to testing and despite not having any subsequently reported "positive" EtG tests, has suffered severe apprehension and anxiety from the fear of again having a false positive EtG test.

43. These so called "positive" EtG tests of Ms. Wilson and the injuries she suffered are as a direct result of the negligence and/or recklessness of the defendants in promoting,

9

advertising, marketing, selling, and/or contracting with the licensing board, and/or designing, implementing, and managing the EtG alcohol testing program, and/or collecting the urine samples and/or performing and/or interpreting the EtG testing and/or utilizing the EtG test to allegedly establish that the plaintiff consumed an alcoholic beverage, when the test lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

44. As a result of these "positive" EtG tests, Ms. Wilson was not allowed to work as a nurse for approximately eight weeks and had her program extended. She was also required to have additional testing, treatment and program attendance.

45. As a further result of these "positive" EtG tests, Ms. Wilson suffered damage to her reputation and credibility in her chosen profession.

46. As a further result of these "positive" EtG tests, Ms. Wilson was later terminated from the program after eating poppy seeds and testing positive for opiates.

47. Ms. Wilson would not have been terminated had she not had these EtG "positives" on her record.

48. As a further result of these "positive" EtG tests, Ms. Wilson has a permanent stain on her license, which would have been avoided had she successfully completed her program.

49. As a further result of these "positive" EtG tests, Ms Wilson now faces at least three years of probation, which includes random urine testing, with attendant costs, and the probable future loss of her license to practice nursing.

50. The stain on Ms. Wilson's license, her damaged reputation and credibility, the apprehension that she will again have a false positive test, and the probable future revocation of her nursing license after years of education and commitment to her profession, have caused

plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that these tests must have been false positives.

51. As a direct and proximate result of the defendants' negligence and/or recklessness, plaintiff has suffered and/or may suffer great, permanent and irreparable harm. These injuries may include, but are not limited to: the active suspension of her license, probation, risk of the loss of her license, loss of earnings and earning capacity, additional expenses associated with random EtG tests and other evaluations and programs, lawyers fees, other pecuniary losses flowing directly and consequentially from the EtG testing, damage to reputation, humiliation, insomnia, depression, anxiety and severe emotional and psychological distress, all or some of which are continuing in nature.

52. As a direct and proximate result of the defendants' negligence and/or recklessness, plaintiff suffered economic damages as a result of lost earnings and consequent costs for medical evaluations, treatment, program attendance and drug screenings. Her monetary losses to date total approximately $9,000 dollars.

53. The aforesaid negligence and recklessness on the part of the defendants was wanton and outrageous in nature.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory damages in an amount exceeding the jurisdictional limits for diversity, and punitive damages, plus interest and costs.

POMERANTZ PERLBERGER & LEWIS LLP

BY: _____/s/_____
Norman Perlberger, Esquire
Eliot H Lewis, Esquire
Attorneys Pro Hac Vice for Plaintiff

Norman Perlberger, Esquire
Eliot H. Lewis, Esquire                           Attorneys Pro Hac Vice for Plaintiff
POMERANTZ PERLBERGER & LEWIS LLP
21 South 12th Street, 7th Floor
Philadelphia, PA 19107
(215) 569-8866
nperlberger@ppl-law.com
ehlewis@ppl-law.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **DEBORAH WILSON,** | : | **CIVIL ACTION NO. C07-3431 BZ** |
| **Plaintiff** | : | |
| | : | |
| vs. | : | |
| | : | |
| **COMPASS VISION, INC. and** | : | |
| **NATIONAL MEDICAL SERVICES, INC.** | : | |
| **D/B/A NMS LABS** | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |

**CERTIFICATION OF SERVICE**

NORMAN PERLBERGER, ESQUIRE, hereby certifies that service of Plaintiff's Amended Complaint was made this date by ecf-filing and first-class mail to the following:

Catherine A. Salah, Esquire            Christian Barrett Green, Esquire
Gordon & Rees, LLP                     Law Offices of Samuel G. Grader
275 Battery Street, Suite 2000         2180 Harvard Street, Suite 400
San Francisco, CA   94111              Sacramento, CA   95815

Joshua A. Ridless, Esquire
244 California Street, Suite 300
San Francisco, CA   94111

/s/
NORMAN PERLBERGER, ESQUIRE

DATED:   January 7, 2008