```
                 UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA


LAURA FUJISAWA, et al.      )
                            )
         Plaintiff(s),      )   No. C07-5642 BZ
                            )
    v.                      )   Related Cases: C07-3431 BZ
                            )                  C08-4118 BZ
COMPASS VISION, INC., et    )                  C09-2016 BZ
al.,                        )
                            )   ORDER DENYING DEFENDANTS
                            )   NATIONAL MEDICAL SERVICES'
         Defendant(s).      )   AND COMPASS VISION'S MOTIONS
_____)   FOR SUMMARY JUDGMENT
```

Plaintiff Dr. Laura Fujisawa was a licensed California pharmacist.  As a result of substance abuse, she entered a rehabilitation program in an effort to maintain her license. She was eventually terminated from the program, principally because of the results of her tests for the presence of Ethyl Glucuronide (EtG) in her system.  She then sued Compass Vision, Inc. (Compass) and National Medical Services, Inc. (National or NMS), for negligently implementing and administering EtG testing in California.  They have now moved

///

///

1

for summary judgment.[1]

## THE PHARMACY RECOVERY PROGRAM[2]

The Board of Pharmacy ("the Board") under the jurisdiction of the California Department of Consumer Affairs operates the Pharmacy Recovery Program (Program) pursuant to California Business and Professions Code § 4360 et. seq. to rehabilitate pharmacists who have a history of drug or alcohol abuse.  On July 1, 2003 the Board contracted with Maximus, Inc. to administer the Program.[3]  The contract required Maximus to provide a variety of body fluid tests to Program participants, but initially did not require Maximus to test for EtG, a minor metabolite of alcohol.  Maximus retained Compass to administer the testing portion of the Program.[4]

## ETG TESTING

On May 13, 2003, in a news release, National announced that it had: "introduced the availability of testing for Ethyl Glucuronide (EtG), a unique marker found in urine for

///

///

---

[1] National's and Compass's motions for summary judgment are nearly identical and the overlapping arguments will be addressed as such.

[2] The Court primarily relies on the Joint Statement of Undisputed facts and other facts which are not reasonably in dispute.

[3] On its website, Maximus describes itself as a company which for nearly 40 years "has partnered with federal, state, and local governments to make public healthcare programs run effectively."

[4] On its website, Compass describes itself as "the top provider of substance abuse testing solutions for healthcare monitoring programs nationwide."

2

1   detection of alcohol consumption."[5]  Dr. Anthony Costantino,
2   National's Vice-President of Operations, stated that "EtG will
3   now be the state of the art technique for detecting alcohol in
4   the urine."  Thereafter, Kim McKown, President of Compass,
5   contacted National to learn more about the test.  National
6   delivered a PowerPoint presentation to Compass on EtG testing.
7   National set 250 ng/ml as the cutoff limit to indicate a
8   positive test, one that would provide a strong indication that
9   the person was recently drinking an alcoholic beverage and
10  detect relapse.  National advised Compass that the cutoff
11  limit was "the administratively determined value at which an
12  action must be taken."  National also provided background and
13  technical materials to Compass to convince it that the EtG
14  test was the "state-of-the-art" test for detection of alcohol
15  and that 250 ng/ml was the appropriate cutoff level.

16       Compass recommended, and the Board agreed, to require
17  Maximus to include EtG testing in the urine substance abuse
18  test.  Participants in the Program were advised that a EtG
19  level of 250 ng/ml would be considered positive and might be
20  considered a relapse regardless of other factors.  Initially,
21  Compass sent urine samples for EtG testing to Northwest
22  Toxicology.  Sometime in 2004, Compass began sending urine
23  samples to National for testing.  National provided the EtG
24  test results to Compass, which provided them to Maximus, which
25  provided the results to the Board.

---

27       [5]   On its website, National describes itself as for more
     than 35 years "setting the standard for excellence in clinical
28   toxicology and forensic testing."

By 2005, doubts about the utility of EtG testing began to appear. On August 15, 2005, Dr. Gregory Skipper, one of the early proponents of EtG testing, issued an advisory memorandum to "Regulatory Board Staff or Members" reminding them of the limitations of EtG testing. Among other things, he advised "whenever possible, to refrain from taking action against an employee or licensee based on EtG testing alone." In September 2006, the U.S. Department of Health and Human Services issue a lengthy "Substance Abuse Treatment Advisory" which reviewed the pros and cons of EtG testing and warned that:

> Currently the use of an EtG test in determining abstinence lacks sufficient proven specificity for use as primary or solo evidence that an individual prohibited from drinking in a criminal justice or a regulatory compliance context, has truly been drinking. Legal or disciplinary action based solely on a positive EtG, or other test discussed in this *Advisory*, is inappropriate and scientifically unsupportable at this time. These tests should currently be considered as potential valuable clinical tools but their use in forensic settings is premature.

In response to this Advisory, National, Compass and others co-authored an article, based largely on tests conducted on 13 Compass employees who consumed controlled amounts of alcohol. Significantly, none of the Compass employees tested substances such as soy sauce or mouthwash, which contain EtG. The article's conclusion was to validate EtG testing and to recommend establishing "250 ng/mL as the cutoff levels for testing and the use of 500 ng/mL as a guideline for intentional consumption of alcohol." That article was provided to Maximus. It is not clear whether it was provided to the Board. Defendants and the Board continued

1   to rely on EtG testing until January 1, 2009 when National
2   discontinued it.

3   **DR. FUJISAWA**

4   In May 2003, Dr. Fujisawa was terminated from her
5   employment for reasons related to her addiction to proscribed
6   substances other than alcohol.  On April 7, 2004, the Board of
7   Pharmacy filed a formal Accusation against Dr. Fujisawa.
8   Pursuant to a stipulated settlement, Dr. Fujisawa entered the
9   Pharmacist Recovery Program ("Program") in December 2004.

10  On March 21, 2006 the Board placed Dr. Fujisawa on
11  probation for five years, subject to various terms and
12  conditions including successful completion of the Program.
13  Specifically, Dr. Fujisawa had to successfully complete random
14  drug screening and abstain from drug and alcohol use.  Dr.
15  Fujisawa eventually underwent 69 Random Body Fluid Tests.

16  On September 26, 2006 Dr. Fujisawa tested positive for
17  EtG with a value of 1800 ng/ml.  A pharmacist review
18  committee, consisting of two Board employees and one from
19  Maximus, reviewed Dr. Fujisawa's file and determined that she
20  had relapsed.  Dr. Fujisawa subsequently returned six
21  additional positive results between October 11, 2006 and March
22  14, 2007.  Dr. Fujisawa was terminated from the Program on
23  March 13, 2007 and her license was suspended as a result of
24  her termination.  A hearing on the Board's petition to revoke
25  Dr. Fujisawa's probation was held on July 23-24, 2008 before
26  Administrative Law Judge Karen Brandt.  Throughout, Dr.
27  Fujisawa maintained that she never consumed alcohol, and that
28  any positive EtG tests were the result of incidental exposure

1   to products, such as hand sanitizers or soy sauce, which can
2   cause positive EtG tests.  The ALJ recommended revoking Dr.
3   Fujisawa's license, but staying the revocation pending a one
4   year suspension and successful completion of five years of
5   probation.  The Board did not adopt ALJ Brandt's decision and
6   revoked plaintiff's licence.  The Board relied primarily on
7   Dr. Fujisawa's positive EtG tests in determining her
8   suitability to practice pharmacy.  Dr. Fujisawa did not seek
9   review of that decision pursuant to California Code of Civil
10  Procedure §§ 1094.5, 1094.6.  This suit followed.
11       In her amended complaint, Dr. Fujisawa alleges that
12  Compass and National were negligent in:

> promoting, advertising, marketing, selling, and/or
> contracting with the licensing board, and/or designing,
> implementing, and managing the EtG alcohol testing
> program, and/or collecting the urine samples and/or
> performing and/or interpreting the EtG testing and/or
> utilizing the EtG test to allegedly establish that the
> plaintiff consumed an alcoholic beverage, when it lacked
> sufficient proven specificity for use as primary or sole
> evidence that an individual prohibited from drinking, in
> a regulatory compliance context, had truly been drinking.

First Amended Complaint ("complaint") ¶ 82.  She alleges that
EtG testing is not a reliable way to determine intentional
alcohol consumption.  Dr. Fujisawa is one of many plaintiffs
around the country that have filed suit alleging that EtG
testing erroneously led to adverse employment actions.
Currently, there are several similar actions pending in this
district, and others in the District of New Jersey, the
Southern District of California, and in state courts.

### Litigation Privilege

National and Compass first move for summary judgment on

6

the grounds that any actions they undertook in relation to Dr. Fujisawa were absolutely privileged under California Civil Code § 47, which provides in part that:

> A privileged publication or broadcast is one made:
> ...
> (b) in any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law . . . .

National contends that its role was solely to provide evidence in the form of EtG testing results to the Board for its use in official proceedings authorized by law. National likens its role to that of a witness providing testimony in an administrative proceeding. National relies on several cases which generally stand for the proposition that statements made in the context of a judicial proceeding are privileged and not actionable. National relies heavily on Silberg v. Anderson, 50 Cal. 3d 205 (1990), holding that allegedly false statements made by an attorney in the context of a judicial proceeding regarding the neutrality of a psychologist were privileged. The issue in Silberg was whether there was an "interest of justice" exception to § 47, not whether the statements might not be a privileged communication. Silberg's claim was that "contrary to [Anderson's] representation" the psychologist was not neutral. Id at 210. Silberg's claim was not based on the sort of conduct present here. See also Harris v. King, 60 Cal. App. 4th 1185, 1188 (1998) (holding that allegedly false statements in a medical report submitted to the State Compensation Insurance Fund were privileged); People ex rel. Gallegos v. Pacific Lumber Co., 158 Cal. App. 4th 950, 958-59

7

1  (1998) (holding that statements made to government agencies
2  during a CEQA administrative proceeding were privileged).
3       Plaintiff responds by arguing (1) that the litigation
4  privilege does not protect non-communicative acts and (2) that
5  she is suing National for two categories of negligent conduct
6  which are not privileged because they did not take place in
7  connection with or in preparation for any kind of judicial
8  proceeding.  The first consists of non-case specific conduct
9  such as "communications by NMS about EtG testing made to the
10 general public or to the scientific community."  Doc. No. 232,
11 p. 13.  This conduct took place before any proceedings were
12 instituted against Dr. Fujisawa and relates to the Board's
13 initial decision to adopt EtG testing as a component of its
14 Program, in reliance on representations made by Compass and
15 National.  The second category of conduct of which Dr.
16 Fujisawa complains is case-specific, such as using the
17 allegedly faulty EtG test to screen Dr. Fujisawa's urine for
18 alcohol and reporting the test to Compass.
19      I do not find National's § 47 argument persuasive for
20 several reasons.  As Judge Cavanaugh noted in Garlick v. Quest
21 Diagnostics, Inc., 2009 WL 5033949, *10 (D.N.J. 2009), in
22 rejecting a similar argument, plaintiff's "claims are not
23 based exclusively" on statements made to the board in judicial
24 or quasi-judicial proceedings.  Instead, plaintiff's claims
25 are based on "defendants' actions and statements associated
26 with the establishment and promotion of EtG testing that has
27 lead to false positives."  Id.  Section 47 may provide
28 protection to National for any communications made in the

8

administrative proceedings, but not for its conduct prior to and leading up to those communications. None of the cases cited by National apply to § 47 in the expansive way that National suggests here.[6] Put another way, "[t]he principal purpose of [the privilege] is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." Action Apartment Assoc., Inc. v. City of Santa Monica, 41 Cal.4th 1232, 1241 (2007) (internal citations omitted). Plaintiff is not attempting to hinder defendants' access to the courts; she is attempting to hinder their ability to promote and implement an ineffective test which harmed her.

Second, none of the cases cited by National or Compass hold that non-communicative conduct is privileged. See Action Apartment Assoc., Inc. v. City of Santa Monica, 41 Cal.4th 1232, 1241 (2007). Their cases hold that communications made during various stages of judicial and quasi-judicial proceedings are privileged; none extended that privilege to underlying, non-communicative conduct. Such a holding would yield results the Legislature could not have intended, given the purpose of §47. For example, it might immunize a party who had defended her actions in an administrative or legal proceeding from a subsequent malpractice action. Section 47

---

[6] Brown v. Lab One, Inc., 2007 WL 6199913 (D.Nev. 2007), cited by National, is readily distinguishable in that the plaintiff's suit was based solely on the communications made by the defendant laboratory. Here, Dr. Fujisawa's claims are premised on conduct that reaches several years prior to Dr. Fujisawa's first negative test.

1 is not nearly as broad as National argues.

**Collateral Estoppel**

National and Compass argue that plaintiff should be estopped from litigating the reliability and validity of EtG testing because such issues were litigated in the proceeding before ALJ Brandt. In the administrative proceeding, the ALJ took evidence on the following two questions:

> 1. Should respondent's [Dr. Fujisawa's] probation be terminated because she tested positive on six occasion for Ethyl Glucuronide (EtG), a metabolite of alcohol?
> 2. Should respondent's probation be terminated because she failed to successfully complete the Pharmacists Recovery Program ("Program"), a condition of her probation?

This argument is unpersuasive for several reasons. First, National and Compass were not parties to that proceeding. It is difficult to conceive how plaintiff would have litigated any negligence against those parties in the administrative proceeding, particularly her claims of negligent marketing, advertising, and promotion of EtG testing. Second, National cites no authority to support its position that the doctrine of collateral estoppel would apply in a situation like this. The only case National discussed was Silberg v. Anderson, 50 Cal.3d 205 (1990), a case decided on Code of Civil Procedure § 47 grounds. That opinion did not discuss collateral estoppel and certainly does not stand for the proposition that National suggests. In Castillo v. City of Los Angeles, 92 Cal. App. 4th 477, 418 (2001) the complaint was dismissed on collateral estoppel grounds because the plaintiff sued the same entity (the City of Los Angeles) after an adverse administrative decision and a subsequent denial of

10

1   a writ of mandate to overturn the administrative decision.
2   Here, Dr. Fujisawa is not suing the Board, the only other
3   entity represented in the administrative proceeding.
4       The issue in this case is not whether Dr. Fujisawa
5   violated the terms of her probation.  The issue in this case
6   is whether National or Compass committed a tort by promoting,
7   advertising, and selling EtG testing as a reliable means of
8   detecting alcohol consumption.

### Administrative Exhaustion

10  National and Compass contend that because plaintiff filed
11  this action a year and a half before the Board issued its
12  final decision that plaintiff failed to exhaust her
13  administrative remedies.  National cited no authority, and the
14  Court is aware of none, that supports the proposition that a
15  plaintiff needs to exhaust her administrative remedies against
16  a state entity before being allowed to sue non-parties to the
17  administrative proceeding.  Here, plaintiff did not sue the
18  Board, and does not seek review of the underlying decision to
19  revoke her license.  Plaintiff seeks damages against two
20  parties that were not parties to, and would not have been
21  proper parties to, her administrative hearing.

### Judicial Exhaustion

23  National and Compass contend that if plaintiff was
24  unsatisfied with the Board's decision to revoke her license,
25  she should have sought review by way of a writ of mandate.
26  Plaintiff did not do so.  However, as previously explained,
27  plaintiff does not seek review of the decision to revoke her
28  license in this action.  Plaintiff's cause of action

1  transcends the issue whether plaintiff violated a term of her
2  probation.  As a term of probation, plaintiff was prohibited
3  from testing at over 250 ng/ml.  Plaintiff does not contest
4  that she tested above those limits.  Instead, plaintiff argues
5  that those limits were prescribed as a result of defendants
6  negligence and were not accurate indicators of alcohol use and
7  relapse.  Those issues were not necessarily determined in the
8  administrative proceeding.

**Duty**

National and Compass raise the same arguments made in their 12(b)(6) motions and argue that they have no duty toward plaintiff.  The Court is not inclined to repeat its analysis of the issue.  See Wilson v. Compass Vision, Inc., 2007 WL 4570613 (N.D.Cal. 2007).  This Court as well as several others have found that defendants National and Compass owed plaintiff a duty of care.  Cleveland v. Compass Vision, Inc., 2008 WL 576755 (N.D.Cal. 2008); Garlick v. Quest Diagnostics, Inc., 2009 WL 5033949 (D.N.J. 2009); Quisenberry v. Compass Vision, Inc., 618 F.Supp.2d 1223 (S.D.Cal. 2007).

**Damages**

National's and Compass's contention that plaintiff cannot establish causation of damages is without merit.  The Board decided to revoke plaintiff's license because it found that she had failed to abstain from alcohol use, as evidenced by six EtG tests over 250 ng/mL.  The board heavily relied on the EtG tests to determine that plaintiff violated the terms of her probation.  Id.  If plaintiff proves that National or Compass negligently established the 250 ng/ml cutoff level, a

1  jury may well determine that such conduct caused plaintiff
2  damages.
3     National repeatedly argues that Dr. Fujisawa was only
4  disciplined based on an examination of a "complete clinical
5  picture."  Reply, p. 3.  However, after reviewing the Board's
6  decision (Beach Decl. Ex. W), it is clear that the Board
7  relied on the six positive EtG tests almost exclusively.  The
8  Board found that Dr. Fujisawa's "test results established that
9  [she] violated the terms of her probation by failing to
10 completely abstain from alcohol use."  Id. at 19.  National
11 has not persuaded me that plaintiff cannot prove, as a matter
12 of law, damages resulting from the aggrieved of conduct.

**11th Amendment Immunity**

14    National and Compass summarily argue that they are immune
15 under the 11th Amendment as an agent of the state but
16 submitted no authority supporting that position.  None of the
17 cases cited involve a broad grand of immunity for any state
18 contractors, let alone independent contractors of state
19 subcontractors.  As the Ninth Circuit stated after analyzing
20 relevant Supreme Court and other Circuit precedent, "the law
21 makes clear that state sovereign immunity does not extend to
22 private entities," merely because they act pursuant to a
23 contract with the state.  Del Campo v. Kennedy, 517 F.3d 1070,
24 1080 -1081 (9th Cir. 2008).

**First Amendment Immunity**

26    Compass advances one argument that National does not -
27 that it is entitled to immunity under the First Amendment for
28 its statements regarding the effectiveness of EtG testing.

13

Compass did not cite any authority to support its position that the First Amendment immunizes it for negligently marketing and administering a faulty testing procedure that had serious repercussions.

**Conclusion**

For the foregoing reasons **IT IS ORDERED THAT** National's and Compass's motions for summary judgment are **DENIED.**

Dated: August 13, 2010

```
                    Bernard Zimmerman
               United States Magistrate Judge
```

G:\BZALL\-BZCASES\FUJISAWA V. COMPASS VISION\NMS MSJ ORD BZ 2 VERSION.wpd

14